[L. A. No. 19452.  In Bank.  Oct. 24, 1947.]

LONG BEACH CITY HIGH SCHOOL DISTRICT OF LOS ANGELES COUNTY, Respondent, v. IRWIN STEWART et al., Appellants.

Dechter, Hoyt, Pines & Walsh, Houser & Houser and J. Everett Houser for Appellants.

Harold W. Kennedy, County Counsel, Ernest R. Purdum and Jesse J. Frampton, Deputy County Counsels for Respondent.

SPENCE, J.—In this proceeding to condemn land for a new junior high school, defendants Irwin Stewart, William Henry Stewart and M. Pearl Coyle have appealed. After a careful review of the entire record we have concluded that the trial court committed no reversible error, and that the judgment should therefore be affirmed. Irwin Stewart is the only defendant on whose behalf points have been presented in appellants' brief and on oral argument. Therefore, for convenience, he will hereinafter be referred to as appellant.

The property condemned consists of five parcels, totaling 18.60 acres, on the outskirts of the city of Long Beach. Appel-

lant, at the time proceedings were instituted, owned Parcel No. 1, consisting of 15.28 acres. The judgment appealed from awards him $20,000 for his property. The entire property was acquired by him in 1905 for the sum of $150 per acre, and he has resided on Parcel No. 1 and has used such parcel for farming operations continuously since that time. In 1906 he built thereon a frame dwelling house, a barn, store-room, and shed. Later a garage was added and a small repair shop, operated by appellant's son, was housed behind the dwelling house in a structure measuring 28 feet by 32 feet. These improvements are of comparatively small value, the highest estimate made by any witness being $2,500, and that was by appellant's own expert. Parcels Nos. 2, 3 and 4 are of lot size. Parcel No. 2 is improved with a stucco dwelling owned by defendants Luman F. Rose and Isabell M. Rose, husband and wife. Parcels Nos. 3 and 4 are vacant lots, approximately 75 feet by 155 feet, which appellant had conveyed to his son, defendant William Henry Stewart, and to his daughter, defendant M. Pearl Coyle. Parcel No. 5 is a six-foot strip of land.

Since appellant's acquisition of the property in 1905, the surrounding tracts on three sides of the entire rectangular strip, including the long north and south sides, have been developed as residential subdivisions. On the fourth or west side is located the Union Pacific Railroad right of way. There has been no industrial development in the vicinity and the only business development, consisting of stores and a beer parlor, is distant 800 feet to one-half mile from appellant's parcel. In 1941, this property, together with the surrounding area, was zoned into a single family residence district. Thereafter the shop of appellant's son was operated under a "non-conforming use permit."

The issues as to public necessity and suitability of the property for the junior high school were determined in respondent's favor by the court sitting without a jury. Thereafter a jury awarded appellant $20,000 as compensation for the taking of his property, and it is this latter portion of the judgment that he attacks upon the present appeal.

Appellant contends: (1) the jury was erroneously instructed to limit their consideration of value to the use to which the property might be put under existing zoning ordinances; (2) the testimony of appellant's expert witness was erroneously limited to statements as to value of the land for

residential purposes; and (3) the court erred in refusing to permit appellant to testify as to the reasons for his opinion as to value.

Appellant first claims that there was error in the instructions given to the jury. He says: "We can state briefly that the error was in the introduction of the idea of 'availability' as a basis for values." In other words, appellant claims that in fixing the market value of the land, "adaptability" for any use should be considered by the jury, but that "availability" should not. Such is obviously not the law, for the jury should consider whether the land is or is not available for particular uses under existing zoning ordinances, as such "availability" does affect market value.

*Los Angeles City H. S. Dist.* v. *Hyatt,* 79 Cal.App. 270 [249 P. 221], was an action in eminent domain for the acquisition of property for school purposes. Upon appeal, it was insisted that the consideration of zoning restrictions to which the property in question was subject was "an unjust handicap to appellant in fixing the award of damages." In denying the validity of the objection, the court stated on page 272: "There might be many considerations which if removed would enhance the value of real property, but when they exist they should be observed. It was the duty of the trial court to consider all conditions having any bearing upon valuations."

*City of Beverly Hills* v. *Anger,* 127 Cal.App. 223 [15 P. 2d 867], was an action by plaintiff city to acquire land for public park purposes. Upon appeal, the chief attack was directed toward the admission in evidence of a zoning ordinance which restricted the use of the lots to construction of one-family dwelling houses. It was asserted that "the city may not take advantage in condemnation proceedings of the decreased valuation of lots which is caused by the enacting of a zoning ordinance, but upon the contrary, that the market value should be estimated on the basis of any reasonable use to which the land may be adapted." (P. 226.) To the contrary, the court stated on pages 227 and 228 that the "enacting of a zoning ordinance which is adopted by a city in good faith and which actually does affect the market value of real property is nevertheless competent evidence in behalf of the city in a subsequent suit for condemnation of the property for public use."

The same principle was enunciated in *City of Beverly Hills* v. *Anger,* 110 Cal.App. 626 [294 P. 476], where it was further indicated at pages 629 and 630 that if there is testimony that demonstrates with ''plausibility'' a prospective use for purposes other than that to which the land is restricted, the jury might be instructed that if it finds in accordance with defendants' evidence, then ''in view of the supposed changes of conditions, the city council in the exercise of its discretion might modify, as indicated, its zoning ordinance, and that in estimating the market value the jury might consider this possible change of the ordinance and the reasonable influence on market value, of such possibility.''

In *Central Pacific Railroad Co.* v. *Pearson,* 35 Cal. 247, this court gave consideration to the matter of ''availability'' when it was insisted that the value of certain land was enhanced by reason of potential wharf privileges. The court said at page 262: ''The testimony in relation to the value of wharf privileges on the shore of the Sacramento river, where the tide ebbs and flows, given for the purpose of enhancing the value of some of the land sought to be appropriated, was also improperly received, for the obvious reason that the party claiming the compensation had no wharf franchise. The mere fact that the party might at some future time obtain from the State a grant of a wharf franchise if allowed to remain the owner of the land, is altogether too remote and speculative to be taken into consideration. The question for the Commissioners to ascertain and settle was the present value of the land in its then condition, and not what it would be worth if something more should be annexed to it at some future time. (*Gould* v. *The Hudson River Railroad Company,* 6 N.Y. 522.)''

The following appears from the opinion of the Supreme Court of Washington in *Bellingham Bay & B. C. R. Co.* v. *Strand,* 4 Wash. 311 [30 P. 144, at page 146]: ''The contention is that all, or nearly all, of the witnesses that testified as to the value of the property taken were allowed by the court to include in their estimate of said value certain prospective rights to the lands below the line of ordinary high tide in the waters of Puget Sound. That the witnesses were allowed so to do is clear from the record, and we must therefore decide whether or not this prospective contingent right was a proper element to be taken into consideration in de-

termining the value of the property taken. We think that it was not. At the time these proceedings were instituted there was no law in force giving to the littoral proprietor any rights whatever in said tide lands, and under the decisions of this court in regard to the rights of littoral proprietors in such lands, the respondents had no valuable rights therein. It was left entirely to the legislature to say whether or not they should have any recognition as such littoral proprietors. Under these circumstances, any value which was placed upon the property taken, by reason of any rights which might or might not be bestowed upon it by legislation, was too remote to constitute an element of value in proceedings of this kind; . . ."

A similar holding by the same court is found in *City of Seattle* v. *Byers,* 54 Wash. 518 [103 P. 791]. This was a proceeding to condemn for a street, land that lay between a street and a cul-de-sac. The opinion recites that appellants "attempted to show that, if the cul-de-sac known as 'Seventh Avenue' should at some indefinite time in the future be vacated by the city, appellants' land would become much more valuable, as they would then, by reason of their present ownership, secure additional property now included in the cul-de-sac. This evidence was speculative, being based upon the remote possibility of a future occurrence, and could not properly be considered in estimating value."

The underlying principles upon which the authorities are based are summarized in Nichols on Eminent Domain, second edition, volume 1, as follows: ". . . the compensation awarded when land is taken by eminent domain is the market value of the land for any use to which it is adapted *and for which it is available.*" (§ 220, p. 671; emphasis added.) It is also said: "When however a particular use of property is prohibited or restricted by law, but there is a *reasonable probability that the prohibition or restriction will be modified or removed in the near future, the effect of such probability upon the value of the property may be taken into consideration.*" (§ 219, p. 669; emphasis added.)

The rules thus enunciated appear to be common sense rules which should govern in fixing market value in cases involving zoning ordinances. In other words, the general rule is that present market value must ordinarily be determined by consideration only of the uses for which the land "is adapted and for which it is available." The exception to this

general rule is that if the land is not presently available for a particular use by reason of a zoning ordinance or other restriction imposed by law, but the evidence tends to show a ''reasonable probability'' of a change ''in the near future'' in the zoning ordinance or other restriction, then the effect of such probability upon the minds of purchasers generally may be taken into consideration in fixing present market value.

We find no prejudicial error in the instructions to the jury in the instant case as they are in substantial accord with the foregoing rules. The jury was instructed on a number of occasions that in determining market value, it might take into consideration not only existing possible uses or wants of the community but such as might reasonably be expected in the immediate future. Instruction No. 26 read: ''You should estimate the compensation to the owner by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future. You should also give consideration to all pertinent circumstances including the location and surroundings of the property, its accessibility to roads and railroads, and other factors affecting the use or uses to which it could reasonably be put.'' Instruction No. 28 informed the jury as follows: ''You are instructed that in fixing the market value on July 21, 1944, of the property of defendants desired by the Long Beach City School District, you should consider all of the uses to which the property is suitable and available, having regard not only to the existing business or wants of the community, but also those that may reasonably be expected in the immediate future.'' The jury was further told in Instruction No. 24 that ''in making inquiry as to the purposes for which the property is suitable, you must not be concerned with the fact that the property has not previously been used for such purposes.''

The only wording found in the instructions which might give appellant any semblance of cause for complaint is the last portion of Instruction No. 21. That instruction read: ''It is not proper to take into consideration speculative or conjectural uses or enterprises or the profits which might reasonably result therefrom. Such matters must be totally excluded from your considerations. You are not to consider uses which are remote or speculative only in their nature and you should not consider possible future uses under altered circumstances

which may or may not arise." As seen from a reading thereof, that instruction is addressed to speculative, conjectural, or remote uses. The "future uses" which "may or may not arise," when interpreted in context with the remainder of the instruction, appear to mean uses of a conjectural or speculative nature. Any misunderstanding by, or misleading of, the jury seems impossible in view of the explicit way in which it was instructed on other occasions that consideration could be given to such uses as might reasonably be expected.

Furthermore, in the present case, unlike the situation presented in the first Beverly Hills case (*supra*, 110 Cal.App. 626), there is nothing whatever in the record tending to show any "reasonable probability that the prohibition or restriction will be modified or removed in the near future." Neither industry nor business has been invading the residential development in the involved area. The zoning ordinance classifying the property as residential was enacted only three years before the condemnation proceedings were started, and it clearly appears that the ordinance is in line with the natural development in such area. Nor is there the slightest suggestion that the ordinance was enacted for the purpose of defeating appellant in his just claims for compensation or that it was not enacted in the utmost good faith. In the words of the second Beverly Hills case (*supra*, 127 Cal.App. 223, 231), it would be "speculative to assume that a change in the provisions of the zoning ordinance is likely to occur."

Appellant next contends that the trial court erred in limiting the testimony of appellant's expert witness.

Appellant's expert, a licensed real estate broker and appraiser, gave as his opinion on direct examination that the "fair market value" of Parcel No. 1, including the improvements, was $17,500. He valued the improvements at $2,500, leaving $15,000, or approximately $980 per acre, as the value of the land. In making such estimate, he had "regard to the needs of the district existing at the time or which may reasonably exist in the immediate future," and he took into consideration "all the factors which I believe would have any bearing on the value of the subject property." He later testified on direct examination that the highest and best use for which the land is naturally adapted is "industrial purposes." The record shows the following further proceedings:

"Q. Taking this same tract you have testified to, involved in this case—these parcels involved in this case—what is your

opinion of its value for an industrial purpose being higher than or less than you would for residential single family homes?

"A. Considerably higher.

"Q. How much higher?

"A. I don't know. I haven't given it sufficient study to determine its fair value for industrial purposes. I confined my opinion to its use as single family residential district, being a single family residential subdivision, on account of the ordinance which is now in force, which is restricted to that use.

"Q. Yes.

"A. I would say to be ultra conservative, at least double the amount.

"[By respondent's attorney] Just a minute. I object to any statement of value which is assumed to be upon property if it should be considered from the standpoint of an industrial site. Certainly he cannot make any statement as to the exact value for any such purpose if he has given it no study.

.    .    .    .    .    .    .    .    .    .    .

"THE COURT: I will sustain the objection."

It will thus be noted that the witness was being interrogated concerning the value of the land in terms of money "for an industrial purpose." Such evidence was clearly inadmissible. As was said in *Sacramento Southern Railroad Co.* v. *Heilbron,* 156 Cal. 408, at page 412 [104 P. 979] : "It is seen, therefore, that this court by its latest utterances has definitively aligned itself with the great majority of the courts in holding that damages must be measured by the market value of the land at the time it is taken, that the test is not the value for a special purpose, but the fair market value of the land in view of all the purposes to which it is naturally adapted; that therefore while evidence that it is 'valuable' for this or that or another purpose may always be given and should be freely received, the value in terms of money, the price, which one or another witness may think the land would bring for this or that or the other specific purpose is not admissible as an element in determining that market value. For such evidence opens wide the door to unlimited vagaries and speculations concerning problematical prices which might under possible contingencies be paid for the land, and distracts the mind of the jury from the single question—that of market value—the highest sum which the property is worth to persons generally,

purchasing in the open market in consideration of the land's adaptability for any proven use.'' (See, also, *Joint Highway Dist. No. 9* v. *Ocean Shore Railroad Co.*, 128 Cal.App. 743, 755 [18 P.2d 413].)

In Lewis on Eminent Domain, third Edition, volume 2, it is said: ''. . . the proper inquiry is, not what is the value of the property for the particular use, but what is it worth in the market, in view of its adaptation for that and other uses.'' (§ 706, p. 1233.)

Nevertheless, before objection was made, appellant's expert had already testified that ''its value for an industrial purpose'' was at least double the amount to which he had previously testified as its ''fair market value''; and this despite the fact that he had apparently believed such consideration to be of so little importance in determining ''fair market value'' that he had not ''given it sufficient study to determine its fair value for industrial purposes.'' That testimony of value for a particular use was not stricken, and its presence in the record probably accounts for the jury's action in awarding to appellant the sum of $20,000, which was $2,500 in excess of the amount declared by appellant's expert to be the ''fair market value.'' Regardless of the existence of any zoning ordinance prohibiting the use of the land for industrial purposes, no claim of error could be successfully predicated upon any ruling which allegedly excluded evidence of value in terms of money for any particular use.

Appellant's final contention is that the trial court erred in not permitting appellant to give his reasons for his opinion as to market value. Appellant gave his opinion that his land was worth $5,000 per acre. His counsel then said: ''Now, your Honor, I don't want him to answer this, but I want this for the record. What do you base this upon?'' Objection was made that this was not a proper question on direct examination, and the trial court sustained the objection. During the discussion, appellant's counsel said: ''I guess that's right. That is all.''

Appellant, by virtue of ownership and residence on his property for a number of years, qualified as a person entitled to express an opinion as to its value. (*Spring Valley Water Works* v. *Drinkhouse*, 92 Cal. 528, 535 [28 P. 681]; *LeBrun* v. *Richards*, 210 Cal. 308, 319 [291 P. 825, 72 A.L.R. 336].) Appellant contends that he not only was entitled to testify as to value but that he was an ''expert witness'' within

the meaning of section 1872 of the Code of Civil Procedure, which, since 1937, provides: ''Whenever an expert witness gives his opinion, he may, upon direct examination, be asked to state the reasons for such opinion, and he may be fully cross-examined thereon by opposing counsel.''

We do not believe that it is necessary to determine whether appellant was technically an ''expert witness'' within the meaning of said section, for in any event we are of the opinion that the trial court erred in sustaining the objection. It is a general rule that an opinion is worth no more than the reasons upon which it is based. (*In re Redfield*, 116 Cal. 637 [48 P. 794]; *Eisenmayer* v. *Leonardt*, 148 Cal. 596 [84 P. 43]; *Winthrop* v. *Industrial Acc. Com.*, 213 Cal. 351 [2 P.2d 142]; *Estate of Finkler*, 3 Cal.2d 584 [46 P.2d 149]; *Estate of Wright*, 7 Cal.2d 348 [60 P.2d 434]; *Messner* v. *Board of Dental Examiners*, 87 Cal.App. 199 [262 P. 58]; *American Trust Co.* v. *Dixon*, 26 Cal.App.2d 426 [78 P.2d 449]; *Mark* v. *Industrial Acc. Com.*, 29 Cal.App.2d 495 [84 P.2d 1071]; *Estate of Buthmann*, 55 Cal.App.2d 585 [131 P.2d 7]; 32 C.J.S. Evidence, § 567, p. 380.) It has long been the rule in will contests that nonexpert witnesses may give their opinions on the issue of competency, but it has been consistently held that ''it is not the mere opinions which are of importance but the reasons given in support of such opinions.'' (See *Estate of Buthmann, supra*, 55 Cal.App.2d 585, 591, and cases there cited.) While there are circumstances in which an opinion, given without a statement of reasons, may be properly considered by the trier of the facts (*Lumbermen's Mutual Casualty Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 492, 500 [175 P.2d 823]), the weight to be ordinarily given to such opinions depends entirely upon the reasons given in support thereof. Accordingly, we hold that appellant should have been permitted to state the reasons for his opinion on market value. If there is any language in *County of Los Angeles* v. *Signal Realty Co.*, 86 Cal.App. 704 [261 P. 536], which would tend to indicate that an owner of property cannot give the reasons upon which his opinion as to market value is based, such language cannot be approved.

There now remains the question of whether the error of the trial court in excluding evidence of appellant's reasons for his opinion requires a reversal of the judgment. This question must be determined in the light of the entire record.

Appellant concedes that his estimate of $5,000 per acre "was greatly in excess of prices quoted by other witnesses and standing by itself appears ridiculous. . . ." The record bears out this statement. Expert witnesses, whose qualifications are conceded by all, were produced by both parties. These experts were asked to give their estimates of the "market value" of appellant's land and not a single estimate of the "market value" given by any expert, including appellant's own expert, was in excess of approximately $980 per acre. In testing the opinions of these experts on cross-examination, the witnesses were examined at length concerning sales in the vicinity. This evidence covered numerous sales made both before and after the enactment in 1941 of the ordinance zoning that area into a single family residence district. This evidence showed that the property in the area had sold at prices ranging from $600 to $700 per acre, and there was no evidence of any sale at any time of land in that general area at a price in excess of $700 per acre. Appellant's estimate of $5,000 per acre as the market value of the land was therefore more than five times the market value per acre given by his own expert and was more than seven times the amount per acre which the evidence showed that any other land in the vicinity had ever brought.

When the objection was sustained to the question under consideration, appellant made no offer of proof and there is not the slightest indication in the record or in the briefs concerning the nature of the testimony which appellant would have given in reply to the question. It can only be surmised that appellant was basing his estimate upon his speculation that the zoning ordinance might be modified at some future time to permit the use of the property for industrial purposes, and that the property might under those circumstances have greatly increased market value. As above indicated, there is nothing in the record to suggest that there is any reasonable probability of such modification in the near future or that any speculative possibility of such modification has had any influence whatever upon the market value of the property. As appellant's estimate of market value was entirely out of harmony with all other evidence in the record, including that given by his own expert, and as appellant has not suggested either in the trial court or in this court any rational basis for such estimate, it seems apparent that such estimate was nothing more than wishful guessing on the part of an interested owner.

It further appears that in the event of another trial, it would be highly probable that appellant would be awarded less, rather than more, than the $20,000 awarded by the judgment from which this appeal was taken. Under these circumstances, we cannot reach the conclusion that the error of the trial court in excluding the evidence in question was prejudicial or "that the error complained of has resulted in a miscarriage of justice." (Const., art. VI, § 4½.)

The judgment is affirmed.

Gibson, C. J., Edmonds, J., and Traynor, J., concurred.

SCHAUER, J.—I dissent. It appears to me that defendant was subjected to unwarranted and prejudicial restriction in the presentation of his evidence and that the majority opinion, affirming the judgment, is unsound in at least two elements:

1. It concedes, as it must, that "the trial court erred in sustaining the objection" of plaintiff to a question asking defendant, who had qualified as an expert witness, to state his reasons for his opinion as to market value. The defendant undoubtedly was better acquainted with the property sought to be condemned, and with the surrounding property, than any other witness. From the record it is apparent that his hope for recovery of what he considered the fair value of his property was based very largely, if not almost exclusively, upon his own testimony, the testimony he expected and was entitled to give. He was permitted to state the value as being $5,000 an acre but was precluded from substantiating his estimate by his reasons. The majority, conceding the error, hold that it was not prejudicial, because, forsooth, "It can only be *surmised* that appellant was basing his estimate upon his speculation that the zoning ordinance might be modified at some future time" and "as appellant's estimate of market value *was entirely out of harmony with all other evidence in the record* . . . and as appellant has not suggested either in the trial court or in this court any rational basis for such estimate, it seems apparent that such estimate was nothing more than wishful guessing . . ." (Italics added.) From the above quotations it appears now to be the law of this state that this court may base its decisions upon its own surmise; furthermore, the novel rule is declared and followed that if the testimony of one witness

is "out of harmony with all other evidence in the record" the testimony of that witness may be substantially disregarded as a matter of law. (The effect of this holding on section 1844 of the Code of Civil Procedure—"The direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact, except perjury and treason" —appears to be left to further surmise.)

2. The second important defect in the majority opinion lies in the fact that it gives lip service to the rule that "damages must be measured by the market value of the land at the time it is taken, that the test *is not the value for a special purpose*, but the fair market value of the land in view of all the purposes to which it is naturally adapted" (italics added) but actually applies the rule to sustain the action of the trial court in limiting the test to "the value for a special purpose." As hereinafter appears more fully the defendant-appellant here was limited in his evidence of the value of his land to estimates based on the special purpose use of single family residential subdivision or farming operation. A statement of the facts elucidates the points above summarized.

In 1905, defendant purchased the tract which in substantial entirety is the subject of this litigation. At that time such tract, a rectangular unit of land located on the southwest corner of Santa Fe Avenue and Columbia Street in Long Beach, had a frontage on Santa Fe of approximately 407 feet and extended westerly some 1,800 feet along Columbia. Prior to this litigation defendant had conveyed to the Union Pacific Railroad for a right of way a strip, 80 feet wide, at the west end of the tract, and to other persons a rectangular plot 75 feet on Santa Fe by 445 feet on Columbia; the remainder of the original tract is the parcel belonging to defendant and involved on this appeal. (Also condemned by plaintiff, but not involved in this appeal, is the rectangular plot described hereinabove.) Defendant's parcel as it now stands comprises approximately 16 acres of land, together with certain improvements thereon. It has a frontage of approximately 338 feet on Santa Fe and 1,275 feet on Columbia, but, except in that area wherein it is diminished by the previously conveyed rectangular plot above mentioned, is in its dimensions approximately 407 by 1,723 feet.

Continuously since 1905, defendant has resided on the parcel in question and used it for livestock and general farming operations. In 1906, he built on it an eight-room frame house, and a barn, storeroom, and shed. Later a garage and shop were added. For some 12 years prior to, and up to the time of, trial (December, 1944) the shop was utilized by defendant's son as a machine shop for the repair of oil well equipment and machinery. Previous to 1941, the entire tract had been zoned for industrial uses, but in that year it was rezoned by the city of Long Beach as a residential district for single family dwellings. At that time and continuing to the time of trial, it had not been subdivided, no streets had been cut into it, it contained no sidewalks or public rights of way and no sewer or gas or water installations except two water wells. The only actual industrial use of the parcel (the portion of the tract still owned by defendant-appellant) disclosed by the record is that of the operation by defendant's son of the machine shop. "It is a regular machine shop with all kinds of machinery in it for heavy work, a big lathe and a drill press and things like that." Immediately west of the property in litigation is a main line of the Union Pacific Railroad and further to the west are railroad classification yards, in which freight is shifted back and forth; also parallel to the westerly border of the property is a high power transmission line of the Southern California Edison Company. Immediately north of Columbia Street is the La Serena Tract, which was subdivided for residential purposes in approximately 1921. Across Santa Fe Avenue, to the east of defendant's property, is another residential subdivision, and a third such subdivision bounds the property on the south. Santa Fe Avenue, on which, as previously mentioned, the property has a frontage of approximately 338 feet, is largely used as a truck boulevard carrying heavy traffic; it has no curbs; it does have a paved center roadway 30 feet wide "and 10 feet of shoulders." Defendant testified that a restaurant, a beer parlor, and "several stores" were established at locations distant 800 feet to one-half mile from his property.

Contrary to the majority opinion, it appears to me that under the circumstances shown, the refusal to allow defendant to state his reasons or basis for the value stated constitutes prejudicial error. Defendant fixed the value at $80,000;

the jury awarded him only $20,000. I do not think we can properly "surmise" that the jury would have attached no weight to defendant's reasons for value which they were not permitted to hear. It was not incumbent upon defendant to make an offer of proof under these circumstances. He was already qualified as an expert and as a matter of law he was entitled to state his reasons for his opinion. The weight to be accorded those reasons was for the jury, not for us.

The prejudice of the error is emphasized by the fact that, as hereinafter appears in more detail, no other witness, either for defendant or plaintiff, appears, in making his appraisal, to have given consideration to any industrial use value of the property, or to its value for any use other than the specific one of "subdivision for single family residences" and, possibly, the still lower use of farming.

All witnesses, in forming their estimates of the present market value of the property, should have given consideration to every use, including the highest and best use, for which such property was adaptable. (*City of Napa* v. *Navoni* (1942), 56 Cal.App.2d 289, 299 [132 P.2d 566].) In *San Diego Land etc. Co.* v. *Neale* (1888), 78 Cal. 63, 69 [20 P. 372, 3 L.R.A. 83], this court referred to *Mississippi & Rum River Boom Co.* v. *Patterson* (1879), 98 U.S. 403 [25 L.Ed. 206], opinion by Mr. Justice Field, and summarized the facts as follows: "[T]hree islands in the Mississippi River were sought to be condemned for the purpose of a boom or storing-place for floating logs. For general purposes the property was of insignificant value, but it was found to have a large value for boom purposes. It had never been used for such purposes, but there was nothing to prevent other persons or companies from engaging in the enterprise if they had seen fit to do so. It was held that the value for boom purposes must govern." The court then quotes from Justice Field's opinion in the Boom case (98 U.S. at 407-408): "In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be, What is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted?—that is to say, what it is worth from its availability for valuable uses. Property is not to be deemed worthless because the owner allows it to go to waste,

. or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated. So many and so varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future.''

Concerning defendant's contention that both the jury and defendant's witness (other than himself) as to the value of his property were erroneously restricted to a consideration of its value for a specific use (for subdivision for single family residential purposes) and were not allowed to give effect to its present value for its highest and best, i. e., potential industrial use, the record discloses the following: The real estate broker and appraiser who appeared as an expert witness on behalf of defendant testified that defendant's property was worth $17,500 for the residential use (in itself largely potential because the property was not yet subdivided) permitted by the zoning ordinance. The record proceeds:

''Q. [By defendant's attorney to the expert witness] Now, I will ask you . . . what is the highest and best use for which it [defendant's land] is naturally adapted? A. Industrial purposes.

''Q. What do you mean by that? A. Manufacturing plant or operation of any kind of an industry that would be useful adjacent to the Long Beach Harbor area. That particular property is on one of the main vehicular traffic arteries going to the City of Long Beach Harbor area, and it is very accessible and it also is near transportation and trackage can be easily put into the property, because the property abuts the Union Pacific Railway lines, and it is adjacent to the classification yard and adjacent to industries, and it has all of the facilities for an industry. There are plenty of power lines and plenty of water for manufacturing plants.

"Q. Taking this same tract you have testified to, involved in this case—these parcels involved in this case—what is your opinion of its value for an industrial purpose being higher than or less than you would for residential single family homes? A. Considerably higher. . . .

"Q. How much higher? A. I don't know. I haven't given it sufficient study to determine its fair value for industrial purposes. *I confined my opinion to its use as single family residential district,* being a single family residential subdivision, on account of the ordinance which is now in force, which is restricted to that use. [Italics added.]

"Q. Yes. A. I would say to be ultra conservative, at least double the amount.

"[By plaintiff's attorney] Just a minute. I object to any statement of value which is assumed to be upon property if it should be considered from the standpoint of an industrial site. Certainly he cannot make any statement as to the exact value for any such purpose if he has given it no study.

"[By defendant's attorney] Keeping in mind this man is an expert and he is qualified as such and he said he viewed the property and that he is conversant with property in the Long Beach industrial districts, I would say that he would be qualified to give an opinion as to its valuation if it were placed on a basis of an industrial site.

"(DISCUSSION.)

"THE COURT: I will sustain the objection."

No other evidence (except possibly the testimony of the defendant, himself, hereinabove mentioned) as to the value of the property for, or upon an appraisal which included consideration of, its assertedly "highest and best" (industrial) use was offered or received. The court thereafter instructed the jury that "You must not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken out by the court; such matter is to be treated as though you never had known of it," and, also, in reference to fixing value, that "you should not consider possible future uses under altered circumstances which may or may not arise." It thus appears that the jury were effectively instructed that they were not to consider defendant's proffered evidence as to the value of his property for its assertedly highest and best use. Furthermore, from the last-quoted instruction, the jury may well have understood that they

could not even consider value for residential purposes because the property had not yet been subdivided, it had no streets, sewer or gas installations, and the making of such improvements would be "altered circumstances which may or may not arise."

Plaintiff produced but one expert witness as to value. That such witness, in making his appraisal, did not consider at all the value of the property for industrial enterprises or for the use for which it was being condemned is evident from his own testimony. The transcript shows:

"Q. [To the witness Hoffman, produced by plaintiff] : I will ask you this, in arriving at the value of the appraisal which you have given us on that tract and the improvements on it, Parcel 1, did you take into consideration the highest and best use for which it was available. . .? A. I did.

"Q. Did you consider its value as an industrial site? A. I did not.

"Q. You did not? A. No.

"Q. Why? A. Because it is zoned for single family residences.

"Q. And you therefore gave it no thought for any other use? A. I did not, except for farm land or subdivision."

A fair reading of the transcript supports no other conclusion than that the entire case, insofar as value is concerned, was tried by plaintiff upon a theory which in effect limited considerations of value to use of the property for subdivision for single family residences and, possibly, for farming operations, a still lower use. The defendant's expert was interrogated at length on direct examination with reference to the value of the property for the specific use of subdivision for single family residences. In their brief, plaintiff's counsel, summarizing the evidence, recognize the fact by the statement that "Respondent's [plaintiff's] appraiser testified that the fair market value of the subject property *for subdivision purposes* was the sum of $12,500 for the land, and $1,000 for the buildings. . . ." (Italics added.)

The rule is settled that in determining the value of land taken by eminent domain "all uses to which it is adapted and might be put" are to be considered, and compensation is to be awarded "upon the basis of its most advantageous and valuable use, having regard to the existing business

or wants of the community, or such as may be reasonably expected in the immediate future.'' (18 Am.Jur. 879-880, § 244, and cases there cited; see *San Diego Land etc. Co.* v. *Neale* (1888), *supra,* 78 Cal. 63, 69-71; *City of Los Angeles* v. *Hughes* (1927), 202 Cal. 731, 735 [262 P. 737].) Thus, in the last-cited case, it was stated with regard to the value of condemned property which had theretofore been planted to nursery stock, that (page 735 of 202 Cal.) ''the true basis for computing the market value of land sought to be condemned, in view of the evidence of its suitability for subdivision purposes, is its value as it stood on the date when, under the law, its value was to be determined, plus any increased value which it may have had in the market by reason of its suitability for subdivision into city lots.'' As observed in *San Diego Land etc. Co.* v. *Neale, supra,* at page 71 of 78 Cal., ''This is not sanctioning a remote or speculative value. It is merely taking the present value for prospective purposes.''

Insofar as concerns the effect upon value which results from the fact that the property is subject to zoning ordinances, I am aware of no authority which holds that consideration shall be given by expert witnesses to only those uses which are permitted by the ordinances at the date as of which the value of the property is to be determined. It has been declared that (*City of Beverly Hills* v. *Anger* (1932), 127 Cal.App. 223, 227 [15 P.2d 867]), ''The question as to whether a zoning ordinance has the effect of increasing or reducing the value of land included within its provisions is one of fact to be established by evidence. Regardless of whether the value of real property is increased or diminished as a result of the application of a zoning ordinance, the ordinance is competent evidence to be considered in a suit for condemnation of property located within the district which is affected thereby, for the purpose of determining the actual market value thereof.'' (Cf. *City of Beverly Hills* v. *Anger* (1930), 110 Cal.App. 626, 629-630 [294 P. 476]; *Los Angeles City H. S. Dist.* v. *Hyatt* (1926), 79 Cal.App. 270, 272 [249 P. 221].)

If, in condemnation cases, a city or county or other plaintiff can completely exclude consideration of certain types of uses, perhaps those to which the property is otherwise best suited, for which it is most valuable, and to which it is

intended to put the property after condemnation, by enacting, or taking advantage under, a zoning ordinance forbidding such uses, but which ordinance can be repealed or amended after the property is acquired, the constitutional guarantee of reasonable compensation upon a taking for public use can be in a large measure circumvented. As previously indicated, all uses to which the land is adaptable may, and they should, be considered. These include the use for which the property is being taken (see *Mississippi & Rum River Boom Co.* v. *Patterson* (1879), *supra,* 98 U.S. 403, 408; *San Diego Land etc. Co.* v. *Neale* (1888); *supra,* 78 Cal. 63, 69; *Sacramento etc. R. R. Co.* v. *Heilbron* (1909), 156 Cal. 408, 412 [104 P. 979]; *City of Stockton* v. *Vote* (1926), 76 Cal.App. 369, 405-407 [244 P. 609]; *City of Stockton* v. *Ellingwood* (1929), 96 Cal.App. 708, 715 [275 P. 228]; *Temescal Water Co.* v. *Marvin* (1932), 121 Cal.App. 512, 519 [9 P. 2d 335]; *Joint Highway Dist. No. 9* v. *Ocean Shore Railroad Co.* (1933), 128 Cal.App. 743, 749, 755 [18 P.2d 413]), not to show the value in use to the condemnor but as an element affecting the present market value (see 29 C.J.S. 1029, § 160). Obviously, here the use of the land for a school building and campus is other than a single family residence or farm use. Equally obvious is the injustice which, whether the financial loss be great or small, is perpetrated upon the landowner by allowing the plaintiff through an unreal rule or application of law to conclusively deny to him that his land presently possesses value for any other than single family residence or farm purposes in the very proceeding by which the land is being acquired for another and higher use. A further demonstration of the vice in application of such unconscionable rule is apparent in this case: Plaintiff's expert based his appraisal on single family residence use, and as a reason for making his valuation for that use low, he pointed out that the property was large in its dimensions, that it had not in fact been subdivided, that it was all in one piece, and that it contained no streets. Yet it appears that in truth those very attributes which depreciated its value for residential use appreciated its value for the use for which it was condemned.

While the fact that a zoning ordinance forbidding particular uses had been enacted would be a material fact affecting the value of property in the zoned district generally, it would

be only one of many facts from which the value of the particular parcel being condemned should be determined, and the fact that such parcel was being taken for a use proscribed by the ordinance would be highly persuasive that the ordinance was entitled to relatively little weight in fixing the market value. I am therefore of the view that in presenting expert testimony as to value defendant was entitled to have the witnesses consider the influence on the present value of his land of uses, including industrial and school, to which the land was particularly adapted by reason of its character, its quantity, its dimensions, its location, its surroundings, its freedom and relative seclusion from public rights of way, the availability of transportation facilities, etc., even though a zoning ordinance presently proscribed or limited such uses.

Such a consideration of potential industrial or other uses by an expert witness does not mean that (as perhaps was sought to be accomplished here) the witness may, independently of his opinion as to the general market value of the property, giving consideration to all of its uses, testify that it has one value for one specified use and another and different value for a different use. (See *Sacramento etc. R. R. Co.* v. *Heilbron* (1909), *supra*, 156 Cal. 408, 410-412; *Joint Highway Dist. No. 9* v. *Ocean Shore Railroad Co.* (1933), *supra*, 128 Cal.App. 743, 754.) Prior to the adoption in 1937 of section 1872 of the Code of Civil Procedure, *supra*, which provides that ''Whenever an expert witness gives his opinion, he may, upon direct examination, be asked to state the reasons for such opinion . . .,'' the rule was, as stated in the Joint Highway Dist. No. 9 case (at page 763), ''it is not proper on direct examination to give in terms of money the value in use of property for any purpose whatever.'' It seems apparent, however, that section 1872 so modifies the earlier rule that an expert witness who has given his opinion of market value of a tract may now, upon either direct or cross-examination, in response to a request to state the reasons for his opinion, explain the various factors he has considered in reaching his opinion.

Whether, upon the exact status of the entire record here (including the facts that both plaintiff's and defendant's experts avowedly based their appraisals of value of the property upon its specific use as a subdivision for single family residences; asserted that they had not considered its possible use for industrial purposes, and, insofar as plain-

tiff's expert is concerned, denied that it had any value for such industrial usage; that defendant's expert testified that its value for industrial purposes would be far greater than for single family residences; and that defendant himself stated a value which was "far greater" than that ascribed to the property by the other experts for the very limited use considered by them but which value defendant was not allowed to attempt to substantiate by expression of his reasons) defendant's witness should have been allowed to testify to the money value of the property for an industrial use, need not now be determined. Upon a new trial, all the qualified value witnesses could be instructed in accordance with the views hereinabove expressed as to the elements which they should properly consider in appraising the market value of the property as of the controlling date (July 21, 1944) and, either upon direct or cross-examination, each could be required to state his reasons for his opinion.

The judgment should be reversed and the cause remanded for a new trial.

Shenk, J., and Carter, J., concurred.